AO 91 (Rev. 5/85) Criminal Complaint

# United States District Court

_____ DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA
V.
JOSE J. GALINHA

**CRIMINAL COMPLAINT**

CASE NUMBER: 04-814-MBB

(Name and Address of Defendant)

I, the undersigned complainant being duly sworn state the following is true and correct to the best of my knowledge and belief. On or about _____ 1998 through 2002 _____ in _____ Bristol _____ county, in the _____ District of _____ Massachusetts _____ defendant(s) did, (Track Statutory Language of Offense) willfully attempt to evade and defeat taxes due and owing to the United States, to wit, Federal employment taxes,

In violation of Title __26__ United States Code, Section(s) __7201__.

I further state that I am a(n) __Special Agent, IRS__ and that this complaint is based on the following facts:
Official Title

See attached affidavit.

Continued on the attached sheet and made a part hereof:   ☒ Yes   ☐ No

_____
Signature of Complainant
John O'Neil

Sworn to before me and subscribed in my presence,

April 7, 2004 @ 3:30 PM.                    at    Boston, Massachusetts
Date                                                    City and State

CHIEF MARIANNE B. BOWLER
Marianne B. Bowler, USMJ                    Marianne B. Bowler, USMJ
Name & Title of Judicial Officer                 Signature of Judicial Officer

This form was electronically produced by Elite Federal Forms, Inc.

# AFFIDAVIT OF JOHN D. O'NEIL

## INTRODUCTION

I, John D. O'Neil, being duly sworn, hereby depose and state as follows:

1. I am a Special Agent with the Internal Revenue Service, Criminal Investigation ("IRS-CI"), assigned to the Boston, Massachusetts High Intensity Drug Trafficking Area ("HIDTA") Task Force. I have been an IRS special agent for twelve years. During this time, I have conducted and participated in numerous complex, multi-defendant investigations involving income tax evasion, currency reporting violations, domestic and international money laundering, bank fraud, drug trafficking, and related crimes.

2. I submit this affidavit in support of a criminal complaint charging Jose J. Galinha ("GALINHA") with willfully attempting to evade federal employment taxes in violation of Title 26, United States Code, Section 7201.

3. I have participated in the investigation described herein and have spoken with other agents and police officers involved in this and related investigations. As a result, I am familiar with all aspects of this investigation. On the basis of this information, I believe that there is probable cause to believe that GALINHA willfully attempted to evade federal employment taxes in violation of Title 26, United States Code Section 7201.

## BACKGROUND

4. Since August of 2002, I have been involved in an investigation of suspected employment tax evasion and structuring of monetary transactions by GALINHA, owner of J.G. Seafood Co., Inc., a fish cutting business located in New

Bedford, Massachusetts. Based on evidence developed during the investigation and my training and experience, I believe that GALINHA failed to report cash wages paid to his employees on quarterly federal employment tax returns beginning with the 1st Quarter of 1998 and ending with the last Quarter of 2002. GALINHA, the owner and operator of J.G. Seafood Co., Inc., cashed company checks on a weekly basis, often in amounts just below the $10,000 federal reporting requirements and used the cash to pay his employees wages "under the table". Further, when weekly cash wages exceeded $10,000, GALINHA cashed company checks made payable to fictitious names at a local sports club, of which GALINHA is the current vice-president, and used that cash to pay employees additional wages for amounts in excess of $10,000.

5. This affidavit is based upon my personal knowledge, analysis of J.G. Seafood books and records, accountant's work papers, bank records and IRS records, information reported to me by other government agents, information obtained from cooperating witnesses in connection with this investigation and admissions made by GALINHA himself. This affidavit does not discuss all of the evidence obtained during the investigation, but only that necessary to establish probable cause to believe that GALINHA has committed the above described offense.

6. Investigating agents interviewed GALINHA on November 20, 2002. GALINHA provided information relative to his fish cutting business and made several admissions as referenced below. GALINHA has been the sole owner and operator of J.G. Seafood Co., Inc. since the inception of the business in the mid-1990's. GALINHA cashes a weekly check in an amount under $10,000, usually on Fridays, to pay his

2

workers. GALINHA admitted that if the payroll for the week was, for instance, $15,000 or $18,000, he would write a check payable to a fictitious name and cash the check at the Portuguese Sports Club. GALINHA admitted that he paid his workers in cash and that his payroll tax returns were false. He admitted that his weekly cash payroll ranged from $6,000 to more than $10,000. He admitted that he knew paying his workers in cash and not reporting the wages to the IRS was illegal.

    7.    During the course of this investigation, I obtained records from Luzo Community Bank of New Bedford, Massachusetts. Bank records show that on August 29, 1994, GALINHA opened business checking account # 01-10650-5 in the name of J.G. Seafood Co., Inc., 16 Hassey Street, New Bedford, Massachusetts. A review of bank records shows that between September of 1994 and December of 2002, checks were written virtually on a weekly basis payable to "Cash" in amounts below $10,000. Nearly all of these checks were endorsed "Jose Galinha" on the back of the check. In early 1998, the weekly checks payable to "Cash" were $9,000 and beginning in April of 1998, the weekly checks began to appear in amounts of $9,500. In February of 1999, the weekly checks payable to "Cash" began to appear in amounts of $9,800. The weekly payroll checks were often in amounts of $9,800 through October of 2002, excluding a period in 2000, when GALINHA began conducting transactions at another bank. Bank records also show that beginning in late 1999, checks payable to various individual names are endorsed with that particular name and either "PSC" or "Portuguese Sports Club" appearing on the back of the check.

8.    During the course of this investigation, I obtained records from First Federal Savings Bank of America. Bank records show that on March 28, 2000, GALINHA opened commercial checking account # 007-3002909 in the name J.G. Seafood, Inc., 38 Hassey Street, New Bedford, Massachusetts. A review of First Federal bank records shows that from March through December of 2000 checks are written on a weekly basis and sometimes more often, payable to "Jose Galinha" and endorsed on the back of the check "Jose Galinha". The amounts of the checks are most often $9,800.

9.    During the course of this investigation, I interviewed a teller from Luzo Community Bank. The teller told me that GALINHA would come to the bank every Friday before lunchtime and cash a check for $9,000 or $9,500. GALINHA would request approximately $8,000 in large bills and $1,500 in small bills. On one occasion, GALINHA cashed a check on a Friday for the usual amount of $9,000 or $9,500. GALINHA returned to the bank the following day, Saturday, and attempted to cash another check. The teller told GALINHA that the total of the two checks was in excess of $10,000 and that she would have to file a report (Currency Transaction Report) because the activity occurred within one banking day. GALINHA left the bank without cashing the check and returned to the bank to cash the check several days later.

10.    During the course of this investigation, I interviewed a 2nd teller from Luzo Bank, who became the bank's commercial teller around May or June of 2002. The teller told me that GALINHA came into the bank every Friday around 9:30 – 10:00 AM and would cash a check for $9,800. GALINHA would request $6,800 in large bills ($100 bills and $50 bills), $1,200 in $20 bills, $400 in $10 bills and $200 in $5 bills. In

4

the fall of 2002, GALINHA did not show up at the bank for two consecutive weeks. Upon returning to the bank, GALINHA told the teller "Uncle Sam is going to catch up with me." GALINHA stopped cashing large checks at that time and began cashing checks for only $1,500. As referenced above, it should be noted that GALINHA was interviewed relative to this investigation on November 20, 2002.

11. During the course of this investigation, I interviewed a teller from First Federal Savings Bank. The teller told me that GALINHA cashed large checks on a weekly basis, the typical amount being approximately $9,800. The checks were made payable to either GALINHA himself or to "Cash". GALINHA told the teller that he had to buy fish and that the boats at the dock do not accept checks. GALINHA would ask for a mixture of $100 bills, $50 bills, $20 bills and $10 bills.

12. During the course of this investigation, I interviewed an employee from the Portuguese Sports Club. The employee told me that GALINHA has been Vice-President of the club for the past three years. GALINHA comes to the club every day around lunchtime. The employee cashes checks for GALINHA on Fridays. The checks are drawn on the account of J.G. Seafood and are payable to GALINHA and other names. The employee does not know any of the individuals to whom the checks are payable. The checks are usually $1,500 or $2,000 and are sometimes as much as $5,000 or $6,000. GALINHA puts the cash from the checks in his pocket.

13. During the course of this investigation, I interviewed an employee of J.G. Seafood Co., Inc. The employee worked for GALINHA from 1992 through 2002. GALINHA paid the employee strictly in cash from approximately 1992 to 1997. The

5

employee was put "on the books" in 1998 and was paid by payroll check at the employee's request from 1998 to 2002. According to this individual, each employee at J.G. Seafood decides whether he/she wants to be paid in cash or by payroll check. According to this individual, GALINHA goes to Luzo Bank every Friday, payday at J.G. Seafood, shortly before lunchtime to pick up cash. According to this individual, GALINHA does not withdraw more than $10,000 in cash from the bank and GALINHA returns to J.G. Seafood after lunch with his two pants pockets filled with cash whereupon the employees line up at GALINHA's office to be paid. IRS records show no record of Forms W-2 issued to this employee from J.G. Seafood for 1995, 1996 and 1997. IRS records confirm that this employee did receive W-2's for 1998, 1999, 2000 and 2001.

14. During the course of this investigation, I interviewed a 2nd employee of J.G. Seafood Co., Inc. This employee began working for GALINHA in 1992 and from 1998 forward has worked part-time for GALINHA on a regular basis. This employee has been paid strictly in cash by GALINHA since 1992. According to this individual, GALINHA gets cash from Luzo Bank every Friday, which is payday, and employees line up at GALINHA's office to receive their cash or payroll check. GALINHA takes the cash from his pocket to pay this employee and the other employees. This employee has never reported any of the cash received from GALINHA as income on tax returns. IRS records show no record of W-2's being issued by J.G. Seafood to this employee for 1998, 1999, 2000 and 2001. According to this individual, in October or November of 2002, GALINHA started paying employees, including this employee, by payroll check and GALINHA said that everyone is now going on the payroll. As

6

referenced above, GALINHA was interviewed relative to this investigation on November 20, 2002.

15.     During the course of this investigation, I interviewed a 3rd employee of J.G. Seafood Co., Inc. The employee began working for GALINHA in 1999. This employee was paid strictly in cash until February of 2002, when the employee requested to be put on the payroll in order to keep a record of what the employee was making. This employee never reported the cash as income on tax returns. During busy times, this employee worked 30-35 hours and sometimes close to 40 hours per week. This employee has always gone to GALINHA'S office to get paid on Fridays. According to this individual, GALINHA was usually handing either cash or a check to another employee. According to this individual, GALINHA hired a lot of immigrants, many Guatemalan, who were paid cash. IRS records show no record of W-2's being issued to this employee by J.G. Seafood for 1999, 2000 or 2001.

16.     During the course of this investigation, records of J.G. Seafood Co., Inc. were subpoenaed for 1994 through the end of 2002 and J.G. Seafood provided some but not all of its books and records. J.G. Seafood provided "disbursement journals" for September-December 1994, October-December 1995, January-June 1996, January-March 1997 and January-December 1999. A review of J.G. Seafood "disbursement journals" shows that each check written from J.G. Seafood's checking account at Luzo Bank is recorded and classified in a particular column as an expense. For 1994, checks payable to "Cash" are all classified in a column labeled "O/S Labor". During 1995 and 1996, the checks payable to cash are classified in a "Misc" column and on several

7

occasions are classified in a "Cash" column. For 1997 and 1998, the checks payable to "Cash" are classified in the "Misc" column and/or the "Sfd Purch" column, sometimes solely in one column, on other occasions split between the two columns. The 1999 disbursement journals show that the checks to cash were split between the "Misc" column, the "Sfd Purch" column and the "Rent" column. For example, a $9,800 check payable to cash would often be broken down as follows: "Misc" ($3,000), "Sfd Purch" ($6,000) and "Rent" ($800). However, the checks payable to cash were not always in amounts of $9,800, nor was the breakdown the same 100% of the time.

17. During the course of this investigation, I interviewed the bookkeeper for J.G. Seafood Co. Inc. The bookkeeper has worked for GALINHA since 1994. The bookkeeper told me that GALINHA would give her his bank statements and cancelled checks and that she would prepare the disbursement journals based on those checks. The bookkeeper was aware that GALINHA paid his workers in cash. The bookkeeper wrote GALINHA's checks for him and would always write a check payable to "Cash" or to GALINHA himself on Friday, payday at GALINHA's instruction. Regarding the disbursement journals, the bookkeeper told me that "O/S Labor" represented Outside Labor, that "Misc" represented Miscellaneous and that "Sfd Purch" represented Seafood Purchases. For the years 1994, 1995 and 1996, the bookkeeper classified checks to cash as either "O/S Labor", "Misc" or "Cash" and told me that she could not recall if she did this because she was instructed by GALINHA or his accountants or if she did this on her own because she did not know what exactly GALINHA was doing with the cash. In 1997, the bookkeeper began splitting the checks

8

payable to "Cash" between "Misc" and "Sfd Purch". For a $9,000 check payable to "Cash" for instance, GALINHA would tell her "I bought $2,000 worth of fish." The bookkeeper would classify $7,000 as "Miscellaneous" and $2,000 as "Seafood Purchases". GALINHA on other occasions would tell the bookkeeper, "Write me a check to cash for $9,000, half is for fish" or "a little over half is for fish". During 1994, 1995 and 1996, GALINHA was buying and selling some fish. In 1997, GALINHA was hired by Tempest Fisheries in New Bedford, MA, to cut fish and was paid by the pound. Shortly after starting with Tempest, GALINHA stopped purchasing fish, as the fish was purchased by Tempest and provided to GALINHA to cut, trim and package. The bookkeeper believes that GALINHA was either paying his employees with the cash or putting some of the cash in his pocket. In early 2000, the bookkeeper stopped splitting the checks payable to "Cash" between "Misc" and "Sfd Purch" (aside from the $800 for rent) because GALINHA told her to "put whatever". The bookkeeper did not know whether GALINHA meant that it did not matter how she classified the checks or whether GALINHA was leaving it up to her to classify the checks however she saw fit. The bookkeeper did not know what GALINHA was using the cash for so she decided to classify the checks to cash as "Miscellaneous" (aside from the $800 weekly cash rent at this time). At the end of 2002, GALINHA was no longer instructing the bookkeeper to write checks payable to "Cash". As referenced earlier, GALINHA was interviewed relative to this investigation on November 20, 2002.

  18. During the course of this investigation, I interviewed the accountants who prepared GALINHA's income tax returns and the corporate tax returns

9

of J.G. Seafood Co., Inc. from 1994 through 2001. The accountants also provided payroll service to GALINHA including the issuance of weekly payroll checks, annual W-2 Forms and the preparation of Forms 941 Quarterly Employment Tax Returns. The accountants told me that Compensation of officers (line 7 Form 1120S Corporate Tax Return) represented compensation paid to GALINHA's son Kevin Galinha or to GALINHA himself. They told me that Salaries (line 8 Form 1120S Corporate Tax Returns) constituted wages paid to employees. The total from line 7 and line 8 Form 1120S would match the total amount of W-2 Forms issued on behalf of J.G. Seafood. These amounts would also match the total amount of wages reported on Forms 941 Quarterly Employment Tax Returns (for all four quarters of each particular year). A review of IRS records for J.G. Seafood including Forms 1120S, Forms W-2 and Quarterly Forms 941 shows this to be true.

19.     The accountants told me that they relied on the disbursement journals of J.G. Seafood to prepare the Corporate Tax Returns Form 1120S. The accountants used the classification "Miscellaneous" from the disbursement journals to compute the expense "Direct Labor" on the Corporate Tax Returns. A review of bank records, disbursement journals and tax returns shows that the total of checks payable to Cash virtually matches the "Direct Labor" expense reported on the corporate tax returns of J.G. Seafood for 1994, 1995 and 1996. The accountants told me that in 1997, GALINHA's bookkeeper began splitting checks payable to Cash between Labor (Misc) and Fish Purchases (Sfd Purch). Around 2000, the bookkeeper began classifying the checks payable to Cash as solely Miscellaneous. Beginning in 2000, the accountants

10

decided to split checks payable to Cash as 50% Direct Labor and 50% Seafood Purchases. As noted above, GALINHA's bookkeeper told me that shortly after being hired by Tempest Fisheries in 1997 to cut fish and be paid by the pound, GALINHA was no longer purchasing fish. GALINHA himself told interviewing agents on November 20, 2002 that he expressed an interest to Tempest Fisheries in cutting fish for others but was told that the trucks would not be allowed on the Tempest lot. GALINHA admitted that he used the checks payable to Cash to pay his workers and that he and his wife would spend any remaining cash on personal items. He admitted that the weekly cash payroll ranged from $6,000 to more than $10,000. GALINHA did not claim to be purchasing fish with the cash from these checks.

20.  A review of Quarterly Employment Tax Returns Forms 941 for the 1st Quarter of 1998 through the final Quarter of 2002 shows that GALINHA reported the following amounts as Gross Payroll (total of 4 Quarters for 1 year):

|       | **Gross Payroll** |
|-------|-------------------|
| 1998  | $128,839.24       |
| 1999  | $214,255.50       |
| 2000  | $204,859.83       |
| 2001  | $177,774.47       |
| 2002  | $166,846.42       |
| Total | $892,575.46       |

21.  The Gross Payroll that GALINHA reported on the Quarterly Employment Tax Returns of J.G. Seafood consisted only of the payroll checks issued by

11

GALINHA. Employees who were given payroll checks also received W-2 Forms at the end of the year. The total amount of W-2's issued by J.G. Seafood matches the total of Gross Payroll reported on Forms 941. These totals also match the amounts reported on the Corporate Tax Return (Form 1120S) for Compensation of Officers (line 7) and Salaries (line 8). The checks cashed by GALINHA and used to pay his employees cash wages "under the table" are not reflected in any of these totals but are substantially over and above these totals. Analyses of the checks cashed by GALINHA at both Luzo Bank and First Federal Bank along with analyses of the "disbursement journals" of J.G. Seafood and the accountant's work papers shows the total amount of cash wages that GALINHA failed to report on Quarterly Forms 941 for 1998 through 2002 to be close to $3,000,000. This analysis allows for rent and other related expenses that GALINHA paid and might have paid with this cash. The additional tax due and owing on such cash wages would be in excess of $700,000.

## CONCLUSION

22.  Based on the information contained in this affidavit, all of which is true and accurate to the best of my knowledge, information and belief, I submit that there is probable cause to believe that Jose J. Galinha failed to report substantial amounts of wages on Employer's Quarterly Tax Returns Forms 941 for the Quarter ending March 31, 1998 through the Quarter ending December 31, 2002 in an effort to evade federal

employment taxes in violation of Title 26, United States Code, Section 7201.

Signed under the pain and penalties of perjury, this 7th day of April, 2004.

_____
SPECIAL AGENT JOHN D. O'NEIL

Sworn to and subscribed before me this 7 day of April, 2004.

_____
HON. MARIANNE B. BOWLER
U. S. MAGISTRATE JUDGE, CHIEF

13